# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES CORP., MULTIFAMILY MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2019-SB6,**<br><br>   **Plaintiff,**<br><br>v.<br><br>**BERGEN LOFTS LLC,**<br><br>   **Defendant.** | Civ. No. 21-11674 (KM)(JBC)<br><br>**OPINION** |

## KEVIN MCNULTY, U.S.D.J.:

  Plaintiff Wilmington Trust, National Association, as Trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2019-SB66 ("Plaintiff") initiated this action against Bergen Lofts LLC ("Borrower") for mortgage and personal property foreclosure.

  Now before the Court are two motions: (1) Plaintiff's motion (DE 30) to impose additional sanctions upon Borrower, and its sole member, Jacob Tauber (together with Borrower, the "Respondents"), for failure to comply with this Court's November 5, 2021 Order (the "Contempt Order") (DE 21); and (2) Plaintiff's motion (DE 31) to recover post-judgment default interest, attorneys' fees, and property protection advances pursuant to the Loan Documents. [1]

---

[1]  Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

1

For the reasons stated herein, Plaintiff's motion to impose additional sanctions is **GRANTED** in part and **DENIED** in part. Plaintiff's motion to recover post-judgment default interest, attorneys' fees, and property protection advances is **GRANTED**.

### I.     Background[2]

On May 24, 2021, Plaintiff filed the Complaint (DE 1) against Borrower for Mortgage Foreclosure (Count I) and Personal Property Foreclosure (Count II). Shortly thereafter, on July 9, 2021, Plaintiff filed a motion for the appointment of a receiver. (DE 6.)

Because Borrower failed to answer the Complaint or otherwise respond to the matter, the Clerk entered default on July 19, 2021. Around two months later, on September 8, 2021, the Court entered an order (the "Receiver Order," DE 13) granting Plaintiff's motion for the appointment of a receiver for all real and personal property owned by Borrower and located at 901 Bergen Street in Newark, New Jersey (the "Property"), appointing Ian V. Lagowitz of Trigild IVL (the "Receiver"). That same day, the Court also granted Plaintiff's motion for default judgment (the "Default Judgment Order") and ordered Plaintiff to file with the Court a submission detailing the updated amount in damages, fees, and costs, and a final proposed judgment, within thirty dates of the Default Judgment Order. (DE 14, 15.)

On September 24, 2021, Plaintiff filed a motion to hold the Respondents in contempt for failure to abide by the Receiver Order (DE 13). (DE 16.) Around two weeks later, on October 8, 2021, after considering Plaintiff's submission of damages (DE 18), the Court entered judgment in favor of Plaintiff and against

---

"DE" = Docket entry number in this case.

"Compl." = Complaint (DE 1)

Defined terms are taken from my prior opinion granting Plaintiff's motion (DE 12) for default judgment. DE 14.

[2]     A more detailed factual background can be found in my prior default judgment opinion. DE 14.

Borrower in the amount of $2,347,037.45, plus additional interest of $492.73 per diem for each day from October 1, 2021 to October 8, 2021 (the "Foreclosure Judgment"). (DE 19.) On November 5, 2021, the Court granted Plaintiff's contempt motion, finding Respondents in contempt of the Receiver Order (the "Contempt Order"). (DE 21.)

Four days later, on November 9, 2021, counsel appeared on behalf of Borrower for the first time. (DE 22.) Borrower filed an application for a temporary restraining order and preliminary injunction pursuant to Fed. R. Civ. P. 65 and L. Civ. R. 65.1, on December 22, 2021, requesting: (1) an order dismissing the Complaint for failure to validly serve process; or (2) in the alternative, an order vacating the Receiver Order, Foreclosure Judgment, and Contempt Orders, and granting Borrower leave to file an answer to the Complaint. (DE 23.) The next day, the Court denied Plaintiff's application for temporary restraints and ordered that Borrower's motion be heard on the ordinary motion schedule. (DE 24.)

On January 20, 2022, the Court approved and signed a consent order between the parties (the "Consent Order") ordering, in part, that: (1) Borrower's motion (DE 23) be withdrawn; (2) Plaintiff not schedule an execution sale on the Foreclosure Judgment with the U.S. Marshal (the "Marshal's Sale") for a date sooner than 45 days from the Court's entry of the Consent Order; (3) Respondents may satisfy the Foreclosure Judgment before the Marshal's Sale, resulting in Plaintiff fully releasing Respondents from liability on the Contempt Order, Loan Documents, and the default judgment entered in favor of Plaintiff against Mr. Tauber personally (the "Guarantor Judgment"),[3] with the exception of obligations that expressly survive repayment and/or discharge of the Loan under the Loan Agreement (*e.g.*, Sections 5.05, 5.26, 9.02(b) and 9.02(h)); and (4) if the Foreclosure Judgement is not satisfied before the Marshal's Sale, Plaintiff may proceed with the Marshal's Sale as scheduled. (DE 29.)

---

[3]   *See* 21cv13386 DE 9 (opinion filed October 12, 2021).

Plaintiff has now filed the pending motions for (1) additional sanctions upon the Respondents for failure to comply with the Contempt Order on February 1, 2022 (DE 30) and (2) post-judgment default interest, attorneys' fees, and property protection advances on March 1, 2022. (DE 31.) Borrower filed a letter submission responding to Plaintiff's sanctions motion on March 11, 2022. (DE 34.) On April 7, 2022, counsel for the parties appeared before the Court for a status conference conducted by video; after the status conference, the Court ordered (1) that the parties argue all outstanding issues identified in the conference through letter submissions, on a court-ordered schedule and (2) all of Borrower's outstanding items be produced to the Receiver by April 21, 2022. (DE 37.)

Borrower's letter submission was submitted on April 28, 2022. (DE 40.) On May 5, 2022, Plaintiff's responded to Borrower's submission. (DE 41.) The pending motions are now fully briefed and ripe for decision.

## II. Discussion

The Court grants Plaintiff's motion for post-judgment interest, attorneys' fees, and property protection advances. Further, the Court grants in part and denies in part Plaintiff's motion for additional sanctions. I address each motion in turn.

### a. Post-Judgment Interest, Attorneys' Fees, and Property Protection Advances

#### 1. Disputed claims for post-judgment contractual relief

In moving for post-judgment interest, attorneys' fees, and property protection advances, Plaintiff argues that it has incurred at least $295,575.48 in post-judgment contractual interest and expenses since the Foreclosure Judgment. This contractual interest and expenses, documented in the motion, consist of:

- $70,953.39 in contractual interest from October 8, 2021, through March 1, 2022, comprising 144 days of interest at the contractual

4

> Default Annual Interest Rate of 8.630% or $492.73 per diem (*see* DE 31-1 at 3; DE 31-2 at 2);
> 
> - $83,026.19 in reasonable attorneys' fees and costs paid or payable to Ballard Spahr from October 8, 2021 through January 31, 2022 (*see* DE 31-1 at 3; DE 31-3 at 2);
> 
> - $134,155.68 in property protection advances, which Plaintiff wired to the Receiver on November 19, 2021, to fund operating expenses at the Property and critical fire and life safety repairs (*see* DE 31-1 at 3; DE 31-2 at 2-3);
> 
> - $4,100.00 in environmental inspection costs paid to EBI Consulting pursuant to a November 16, 2021 invoice (*see* DE 31-3 at 3; DE 31-2 at 3); and
> 
> - $3,340.49 in other advances for liability and property insurance, paid to Alliant Insurance Services Inc. pursuant to a January 24, 2022 invoice (*see* DE 31-3 at 4; DE 31-2 at 3.)

Although New Jersey law generally "prohibits a plaintiff from asserting a post-judgment claim based on the terms of the contract,"[4] Plaintiff asserts that the cited Note and Mortgage provisions satisfy the Third Circuit's "merger doctrine" exception: by which "[a] provision in a mortgage can survive merger if 'the mortgage clearly evidences [an] intent to preserve the effectiveness of that provision post-judgment."[5] According to Plaintiff, the Loan Documents clearly demonstrate the parties' intention "to preserve [Plaintiff's] rights post-judgment to collect default interest as well as its reasonable attorneys' fees and costs and reimbursement for its advances." (DE 31-1 at 5.)

The parties do not dispute that, in general, the Note and Mortgage entitle Plaintiff to both post-judgment interest and attorneys' fees and costs. I discuss here some points of disagreement, or potential disagreement.

---

[4]   *See In re 388 Route 22 Readington Holdings, LLC*, No. 18-30155 (KCF), 2020 WL 6707958, at *4 (D.N.J. Nov. 16, 2020), *appeal dismissed sub nom.*, No. CV 20-3462, 2021 WL 6102086 (3d Cir. Aug. 13, 2021)

[5]   DE 31-1 at 4 (citing *388 Route 22*, 2020 WL 670958 at *4 (quoting *In re Stendardo*, 991 F.2d 1089, 1094 (3d Cir. 1993)); *see also In re A&P Diversified Techs. Realty, Inc.*, 467 F.3d 337, 342 (3d Cir. 2006) ("Although we decided *Stendardo* applying Pennsylvania law, we predict that the Supreme Court of New Jersey would find the exception to the merger doctrine … similarly applicable in New Jersey.")

5

### *2. Interest*

As to post-judgment interest, the Court grants Plaintiff's motion. The parties do not dispute that post-judgment interest is owing, but Plaintiff argues that the Loan Documents entitle it to post-judgment interest at the contractual default rate, as opposed to the generally applicable statutory post-judgment interest rate applies, *see* 28 U.S.C. § 1961.

Here, Plaintiff highlights Section 38 of the Mortgage, titled "Obligation to Pay at Default Rate," which states as follows:

> Borrower agrees that it is the intention of Borrower and Lender that in the event of a foreclosure or other action to enforce terms of any or all of the Loan Documents, and the entry of a judgment in such foreclosure or other enforcement action ("Judgment"), Borrower's obligation to pay Lender interest at the Default Rate (as defined in the Note), any taxes, insurance, premiums or other charges advanced by Lender, or attorney's fees or other costs and expenses incurred by Lender with respect to any or all of the Loan Documents, whether paid or incurred before or after the entry of such Judgment, will not be deemed to have merged into the Judgment and will survive the entry of such Judgment and continue in full force and effect until all such sums have been paid in full to Lender.

(DE 1-1, Ex. B at § 38 ("Mortgage").)

Generally, "[p]ost judgment interest in federal courts is governed by 28 U.S.C. § 1961, even in matters arising under diversity jurisdiction." *Geiss v. Target Corp.*, Civ. No. 09-2208-RBK, 2015 WL 5227620, at *2 (D.N.J. Sept. 8, 2015) (citing *Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 548 (3d Cir. 1988)). Section 1961(a) directs the Court to apply post-judgment interest to "any money judgment in a civil case recovered in a district court," to calculate the rate "from the date of the entry of the judgment," and to set the "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." Section 1961(b) also directs the Court to compute interest "daily to the date of payment" and to "compound [interest] annually."

6

The Third Circuit has not squarely addressed the question "of whether the parties may contractually agree to a post-judgment interest rate different from that set forth in § 1961." *See Talen Energy Mktg., LLC v. Aluminum Shapes, LLC*, No. CV 19-4303, 2021 WL 534467, at *5 (E.D. Pa. Feb. 12, 2021) (citing *TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439, 474 (M.D. Pa. 2013), *amended* (M.D. Pa. Apr. 8, 2013). Other circuits, however, have permitted parties to alter Section 1961's federal-post judgment interest rate through "clear, unambiguous and unequivocal [contractual] language." *See Jack Henry & Assocs. v. BSC, Inc.*, 487 Fed. Appx. 246, 259-60 (6th Cir. 2012) ("the federal rule applies the contract language includes 'language expressing an intent that a particular interest rate apply to judgment or judgment debts' that is 'clear, unambiguous[,] and unequivocal.'") (citation omitted); *Kanawha-Gauley Cola & Coke Co. v. Pittston Minerals Grp., Inc.*, 601 Fed. Appx. 247, 255 (4th Cir. 2012) (applying federal interest rate in absence of "clear, unambiguous, and unequivocal language" in parties' agreement); *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004) ("If parties want to override the general rule on merger and specify post-judgment interest rate, they must express such intent through 'clear, unambiguous and unequivocal' language") (citations omitted).

The Court finds that Section 38 of the Mortgage contains such "clear, unambiguous, and unequivocal language":

> Borrower's obligation to pay Lender interest at the Default Rate (as defined in the Note) … whether paid or incurred before or after the entry of such Judgment, will not be deemed to have merged into the Judgment and will survive entry of such Judgment and continue in full force and effect until all sums have been paid in full to Lender.

(Mortgage § 38.) Here, the Mortgage clearly states that Borrower's obligation to pay interest at the contractual Default Rate, regardless of whether incurred before or *after entry of a judgment in a foreclosure or other enforcement action*, is (1) not merged into the entry of a judgment and (2) survives the entry of such a judgment until Borrower's debt is fully satisfied. Such language is sufficiently

7

distinguishable from contractual provisions that courts have found to be too ambiguous to override the federal statutory rate. *Compare Talen*, 2021 WL 534467 at *5 (applying federal rate to contractual language stating that interest shall be paid "on any overdue amounts at the lesser rate of 1.5% per month or the highest rate permitted by law until paid in full ...") with *Hymel v. UNC, Inc.*, 994 F.2d 260, 265-55 (5th Cir. 1993) (finding contract language providing that "all past due interest and/or principal shall bear interest from maturity until paid, both before and after judgment" to be sufficiently clear).

Post judgment interest is therefore awarded at the contractual default rate.

### 3. *Property protection advances, operating expenses, attorney's fees & costs*

As to costs and expenses, including attorney's fees, Plaintiff points to Section 9 of the Note, titled "Payment of Lender's Costs and Expenses":

> Lender will have the right to be paid back by Borrower for Lender's entire costs and expenses, including Attorneys' Fees and Costs, resulting from any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those costs and expenses incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay) or judicial or nonjudicial foreclosure proceeding. Borrower agrees that, in connection with each request by Borrower under this Note or any other Loan Document, Borrower must pay all Attorneys' Fees and Costs and expenses incurred by Lender, regardless of whether the matter is approved, denied or withdrawn.

(DE 1-1, Ex. A at § 9 ("Note").) Plaintiff also cites the passage from the Mortgage, quoted in full at p.6, *supra*, providing that

> any taxes, insurance, premiums or other charges advanced by Lender, or attorney's fees or other costs and expenses incurred by Lender with respect to any or all of the Loan Documents, whether paid or incurred before or after the entry of such Judgment, will not be deemed to have merged into the Judgment and will survive

>  the entry of such Judgment and continue in full force and effect until all such sums have been paid in full to Lender."

(Mortgage, DE 1-1, Ex. B § 38.)

Borrower objects, in part, to Plaintiff's request for $134,155.68 in "property protection advances and … operating expenses at the Property." (DE 40 at 3.) Borrower argues that these property protection advances, which the Receiver requested from Plaintiff in response to a Funding Request, were not actually incurred but "based on estimated/proposed expenses." (DE 40 at 4; *see also* DE 31-2; DE 41-3.) Therefore, Borrower asserts that any post-judgment damages should be based on "actually incurred" expenses, not estimates, and requests that Plaintiff provide the Court "with an interim report which demonstrates [actual] expenses" at the Property. (DE 40 at 4.)

Attached to Plaintiff's letter submission is a declaration from the Receiver which attempts to demonstrate how the Receiver actually spent the $134,155.68 in property protection advances. Specifically, the Receiver's declaration includes (1) the Funding Request, made by the Receiver to Plaintiff, for $134,155.68 (DE 41-3); and (2) monthly receiver reports from December 2021 through February 2022, which document $58,298.40 in actual charges for the contractor work identified in the Funding Request (*see* DE 41-4; DE 41-5; DE 41-6). (DE 41-1 at 7-8.) Any advanced funds left over from the Funding Request, says the Receiver, were used "to pay the budgeted operating expenses and utility charges for the [p]roperty." (DE 41-1 at 8.)

The Court finds that Plaintiff is entitled to the entirety of the $134,155.68 in disputed property protection advances. Pursuant to the Mortgage and Note, (1) "costs and expenses incurred … after the entry of … Judgment will not be deemed to have merged into the Judgment" (Mortgage § 38) and (2) "Lender will have the right to be paid back by Borrower for Lender's costs and expenses … including those costs and expenses incurred in post-judgment collection efforts." (Note § 9.) Plaintiff has adequately documented (1) the contractor charges for proposed work identified in the Funding Request and (2) capital contributions made by the Receiver, from the balance of the

advanced funds, to meet the Property's operating expenses (*e.g.*, utilities, professional fees, repairs and maintenance) in light of its net negative operating income. (*See* DE 41-4 at 7-8; DE 41-5 at 41-42; DE 41-6 at 166-167.)

The Loan Documents quoted at pp. 8–9, *supra*, also entitle the Plaintiff to attorney's fees. I have reviewed Plaintiff's billing records and find that the incurred fees and costs are reasonable under the circumstances.

As in the case of default interest, *see* Section II.a.2, *supra*, I find that the documents clearly and unequivocally state that the contractual entitlement to costs and fees does not merge into the judgment. I therefore grant Plaintiff's motion for property protection advances, operating expenses at the Property, and attorney's fees in its entirety.

### b. Additional Sanctions

On September 24, 2021, Plaintiff filed a motion (DE 16) to hold the Respondents in contempt of the Receiver Order. (DE 13.) Plaintiff asserted that despite the efforts of Plaintiff's counsel and the Receiver, the Respondents failed to (1) "provide a point of contact for the transition of control" of the Property, (2) " '[t]urn over to the Receiver the possession of the Property" or any item or information necessary to operate and manage the Property," or (3) to "[c]ooperate and use their best efforts to ensure a smooth transition of the management and operation of the Property to the Receiver," in violation of the Receiver Order. (DE 16-1 at 5.)[6]

---

[6] Section 4 of the Receiver Order imposes several obligations on "Borrower and its officers, directors, general partners, agents, property managers ... and all other persons with actual or constructive knowledge of [the Receiver Order] and their agents and employees." Receiver Order § 4. Among these obligations include (1) "[t]urning over to the Receiver ... all keys to all locks on the [p]roperty, and the records, books of account, ledgers and all business records for the [p]roperty," (2) "[c]ooperat[ing] and us[ing] their best efforts to ensure a smooth transition of the management and operation of the [p]roperty to the Receiver," and (3) "[w]ithin three days of [the Receiver Order] ... provid[ing] the Receiver with the name, title, address, telephone number and email address of a designated representative of Borrower with whom the Receiver shall communicate about the obligations expressed in [the Receiver Order]." *Id.* at § 4(a), (g)-(h).

The Court granted Plaintiff's contempt motion on November 5, 2021, and ordered the following relief:

- [W]ithin three days of the entry of [the] Order, Respondents shall purge their contempt by: (i) complying in full with their transition obligations under Section 4 of the Receiver Order; (ii) ceasing and desisting, and causing their property manager, Vivo management, to cease and desist, from communicating with tenants, receiving or retaining rents, entering upon the property or otherwise interfering with the Receiver's performance of his duties under the Receiver Order; and (iii) accounting for and turning over to the Receiver any and all rents received by Respondents from tenants at the property since the entry of the Receiver Order on September 8, 2021.
- Respondents shall be subject to monetary penalties in the amount of $5,000.00 for each day thereafter that they remain noncompliant with the Receiver Order or terms of this Order.

(DE 21.) Despite the Court's intervention, Plaintiff claim that Respondents have continued to violate both the Receiver and Contempt Orders. Plaintiff appears to argue that Respondents remain in violation of the Court's Orders in three ways.

First, Plaintiff asserts that Vivo Management ("Vivo"), "a Newark-based property management company that, upon information and belief, is directly or indirectly owned and/or controlled by [Mr. Taubert]," improperly retained $7,231.85 in "management fees" *after* the Receiver was appointed by the Court. (DE 41-1 at 2; *see also* DE 40 at 3.) Borrower responds that during the approximately two months that Vivo collected the management fees, "[Borrower] was unaware of the receivership, [and] Vivo continued to collect rents and was paid its management fee from the rents collected." (DE 40 at 3.) According to Borrower, it should not be required to refund the disputed management fees because (1) "Vivo's continued operation … ultimately benefited the Receiver," (2) the rents collected by Vivo "were ultimately disgorged to the Receiver," (3) if Vivo had not collected rents during this time period, "the Receiver would have had to pursue the tenants himself," and (4) "Vivo continued to manage the Property for the Receiver's benefit." (*Id.* at 3.)

11

Second, Plaintiff claims that Vivo is still collecting rents from tenants and/or their government assistance providers, despite the Receiver and Contempt Orders. (DE 41-1 at 5; *see also* DE 49 at 2.) In support of this claim, Plaintiff cites emails sent by Vivo to at least two tenants, reminding said tenants to make a rental payment to Vivo. (*See* DE 41-1 at 4; DE 41-2.) According to Plaintiff, it has no knowledge of whether Vivo is sending similar communications to other tenants and/or government agencies, which would "explain why some tenants are not making their rental payments." (DE 41-1 at 5.)[7]

Borrower asserts that it has supplied the Receiver with all "information related to tenant subsidies received by [Borrower]." (DE 40 at 2.) Further, Borrower has since filed a declaration from Israel Silberstein, a Vivo Employee, stating that (1) "[a]ll rental payments for the … property have been turned over to the receiver for that property except for 3 checks totaling approximately [$9,500.00] … that [he] mistakenly deposited in [Vivo's] business account" and (2) he "will ensure that the full amount of the inadvertently taken rent is transferred immediately to the receiver" and will not repeat the "same mistake again." (DE 48.)

Third, Plaintiff argues that that Receiver should be reimbursed for pre-receivership water charges for the Property. According to Plaintiff, Vivo and Borrower failed to pay the Property's water bills for nearly two years prior to the receivership, "resulting in an arrearage of $15,761.81." (DE 41-1 at 6.) The Receiver purportedly paid these charges "to stop the accrual of late fees and penalties and avoid the risk of a shut-off," which the Receiver argues is consistent with Section 3(a) of the Receiver Order, providing in part that: "the Receiver may … pay any pre-receivership obligations of Borrower in the Receiver's sole and absolute discretion and after exercising its business

---

[7]   According to Plaintiff, 8 out of the 14 current tenants at the Property have their rents "paid by third-party governmental agencies through Section 8 of the Housing Act and/or state and local government assistance programs." DE 41 at 4.

12

judgment." (*Id.* at 6 (citing Receiver Order § 3(s)).) On the other hand, Borrower asserts that the Receiver's payment of these pre-receivership water charges are "expenses and advances," which the Borrower is not required to fund under the Receiver Order. (DE 40 at 2.)

A party seeking a civil contempt order must establish that (1) a valid order existed, (2) the person had knowledge of the order, and (3) the person at issue disobeyed the order. *See John T. ex re. Paul T. v. Del. County Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003). These elements must be proven by clear and convincing evidence, with any ambiguities being resolved in the favor of the charged party. Indeed, the court should not grant a contempt citation if there is a ground to doubt the wrongfulness of the party's conduct. *See Harris v. City of Phila.*, 47 F.3d 1311, 1326 (3d Cir. 1995).

The first element is not disputed by the parties. With respect to knowledge, Borrower asserts it was not aware of either the Receiver or Contempt Orders. (DE 40.) The Court finds, however, that Borrower was placed on proper notice and must be deemed to have had such knowledge.

In the motion for contempt, Plaintiff submitted that: (1) Plaintiff's counsel emailed a copy of the Receiver Order to Mr. Tauber on September 8, 2021;[8] (2) Plaintiff's counsel mailed a formal "DEMAND FOR COMPLIANCE WITH ORDER APPOINTING RECEIVER" (the "Compliance Demand") and a hard copy of the Receiver Order, to Mr. Tauber via FedEx on September 14, 2021,[9] which FedEx confirmed delivered the next day;[10] and (3) the Receiver emailed Mr. Tauber to discuss the property on September 20, 2021. (DE 16-1 at 4-5.) According to Plaintiff, the Respondents never responded to any of these communications, and to date, Respondents have not provided any explanation for the lack of

---

[8]   A hard copy of the email is attached to the motion for contempt. DE 16-1 at 8-9.

[9]   A copy of the Compliance Demand can be found at DE 16-1 at 10-12. The Compliance Demand was also emailed to Mr. Tauber.

[10]   A hard copy of the delivery confirmation email can be found at DE 16-1 at 13-15.

response. At any rate, there is no sworn submission contradicting this evidence of mailing and emailing.

Moreover, in Plaintiff's response to Borrower's letter submission, the Receiver declared that he personally telephoned Vivo's offices in September 2021. The Receiver states that, when he identified himself, an "unidentified Vivo employee" hung up on him. (DE 41-1 at 2-3.) The Receiver also asserts that after he caused the locks at the Property to be changed, Vivo "hired a locksmith to remove and replace [the Receiver's locks]." (*Id.* at 3.) Respondents have similarly failed to contradict this evidence with any contrary evidence.

The Borrower, duly served with the summons and complaint, chose to default. Borrower's counsel did, however, finally appear in this action on November 9, 2021, about three months prior to the instant motion for additional sanctions. Even on the assumption, invalid in my view, that the Borrower was previously unaware of the Receiver and Contempt Orders, no such contention is plausible in the period since Borrower's counsel appeared in an effort to defeat or at least slow down the effect of those very orders. The Consent Order, entered by the parties nearly seven months ago, on January 20, 2022, is clear: it expressly states that the Borrower and Mr. Tauber "shall remain in compliance with the Receiver Order until the receivership is terminated." (DE 29.) The Court therefore finds that there is clear and convincing evidence of Borrower's knowledge of the requirements of the Receiver and Contempt Orders.

As for the third element, the Court finds that the Respondents have violated and remain in violation of the Contempt and Receiver Orders. For one, Borrower has refused to disgorge $7,231.85 in management fees paid to Vivo *after* the Receiver Order. Section 3(a) of the Receiver Order clearly provides that the Receiver is empowered "to demand, collect and receive the rents, income, revenues, proceeds and profits derived from tenants at the Property, … including … management fees … which are now due and unpaid or which may become due hereafter (collectively, the 'Rents')." (Receiver Order § 3(a).) Section

14

4(f) also provides that "Any Rents[11] received by Borrower or its property manager after the date of [the Receiver Order] shall be immediately turned over to the Receiver[.]" (*Id.* § 4(f).)

The parties do not dispute that Vivo received these management fees *after* the Court's entry of the Receiver Order. It is therefore immaterial whether Borrower believes that Vivo's "continued operation at the Property ultimately benefited the Receiver"; pursuant to the Receiver Order, the Receiver is entitled to any rents and management fees[12] collected after the Receiver was appointed. Although Borrower claims that it has disgorged all rents collected after entry of the Receiver Order, Respondents are still in contempt for so long as they refuse to disgorge the retained management fees.

Next, while Borrower claims to have turned over to the Receiver (1) information related to tenant subsidies received by Borrower and (2) all rental payments for the property (*see* DE 40 at 2; DE 48 at 2), Plaintiff has submitted evidence of Vivo's continued rent collection efforts as recently as May 1, 2022. (*See* DE 41-1 at 5; DE 41-2.) Additionally, in Plaintiff's July 22, 2022 letter, Plaintiff still asserts that Mr. Tauber and Vivo continue "to pursue and collect rents from tenants and/or their governmental assistance providers throughout the duration of the relationship." (DE 49.) It is true that the Borrower has since belatedly transferred another $9,500.00 in inadvertently collected rents to the Receiver (on July 13, 2022). Despite requests from Plaintiff, the Receiver, and Borrower's counsel, however, Vivo has still not accounted "for the dates, payors, or tenants to be credited" for these funds. (DE 49 at 2.) The Court finds that such conduct, along with the evidence of Borrower's continued rent collection efforts, violates the Receiver and Contempt Orders and unduly interferes with the Receiver's performance of his duties.

---

[11]     Which includes "management fees" as defined earlier in the Receiver Order.

[12]     As Borrower admits, these management fees were taken "from the rents collected." DE 40 at 3.

I will not, however, find Borrower in contempt as to the pre-receivership delinquent water bills. The Court has granted Plaintiff's request for property protection advances, and Plaintiff's submissions clearly demonstrate that the Receiver requested an advance from Plaintiff, in part, to pay the City of Newark for "past due" water bills. (*See* DE 31-2; DE 41-3.) The Receiver also attested that (1) all the itemized charges in the Funding Request, including the $15,756.81 in overdue water bills, were paid and reflected in the receiver reports, (2) there was a leftover balance from the advanced funds, and (3) any leftover balance from said funds were subsequently applied to the property's operating expenses. (DE 41-1 at 8.)

Section 8 of the Receiver Order provides that "[t]o the extent that Plaintiff elects to make Additional Advances, they shall be: (a) deemed part of the Obligations; and (b) secured by the Property in accordance with the terms of the Mortgage and the other Loan Documents, with the same priority as the existing Obligations. (Receiver Order § 6.) Considering this language, along with the previously discussed Note and Mortgage provisions entitling Plaintiff to costs and advances (*see* Mortgage § 38; Note § 9), the Court does not believe that there is clear and convincing evidence that Borrower disobeyed the Receiver Order by not reimbursing *the Receiver* for these pre-receivership charges.[13] Moreover, the Court has granted Plaintiff's request for the property protection advances, meaning that the Plaintiff will ultimately be reimbursed for funding these pre-receivership obligations.

---

[13]   Notwithstanding Section 3(s) of the Receiver Order, which states that "the Receiver may, but shall not and cannot be compelled to, pay any pre-receivership obligations of Borrower in the Receiver's sole and absolute discretion and after exercising its business judgment." Receiver Order § 3. Although the Receiver may have had the discretion to pay these pre-receivership obligations, to the extent these obligations were paid for with funds advanced by Plaintiff, Section 8 provides that these advances be deemed part of the overall loan balance.

16

### III. Conclusion

For the reasons set forth above, the Court grants Plaintiff's motion (DE 31) to recover post-judgment default interest, attorneys' fees and property protection advances. Plaintiff is to submit a form of final judgment.

The Court also grants in part and denies in part Plaintiff's motion (DE 30) to impose additional sanctions upon the Respondents, for failure to comply with the Contempt Order (DE 21). The Court orders Borrower to (1) cease and desist from pursuing, collecting, or retaining future rents, or having any further contact with tenants and/or their governmental assistance providers with respect to the Property, (2) reimburse $7,231.85 in retained management fees to the Receiver, and (3) account for the dates, sources, and intended beneficiaries of the $9,500.00 inadvertently taken rents; however, Borrower is not required to reimburse the Receiver for $15,756.81 in pre-receivership water bills.

Plaintiff shall file with the Court a proposed order detailing the updated amount in fees and costs within seven days of this opinion.

Dated: July 29, 2022

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**